# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LOWER SUSQUEHANNA RIVERKEEPER ASSOCIATION, WATERKEEPER ALLIANCE, and PENNENVIRONMENT,<br><br>　　　　Plaintiffs<br><br>　v.<br><br>TALEN ENERGY CORPORATION, and BRUNNER ISLAND, LLC,<br><br>　　　　Defendants | )<br>)<br>)<br>)<br>)<br>)　Case No._____<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT

### Nature of the Case

1.     The Lower Susquehanna Riverkeeper Association, Waterkeeper Alliance, and PennEnvironment (hereinafter collectively "Plaintiffs" or "Citizens"), by and through their counsel, the Environmental Integrity Project ("EIP"), hereby file this Complaint against Talen Energy Corporation ("Talen") and Brunner Island, LLC ("Brunner") (collectively, "Defendants") for significant

1

and ongoing violations of the Clean Water Act, 33 U.S.C. § 1251 *et seq*. ("CWA"), and Pennsylvania's Clean Streams Law, the Act of June 22, 1937, P.L. 1987, *as amended*, 35 Pa. Cons. Stat. § 691.1 *et seq*. ("CSL"), at Defendants' Brunner Island Steam Electric Generating Station ("Brunner Island"), located at 1400 Wago Road – Brunner Island, York Haven, East Manchester Township, Pennsylvania 17370-0221.

2.      Brunner owns and operates Brunner Island, a coal- and natural gas-fired electric generation facility, and is a subsidiary of Talen. Talen and Brunner are each responsible, jointly and severally, for the violations alleged herein. Brunner Island has been operating as a coal-fired generation facility since 1961 and was previously owned by PPL Brunner Island, LLC. Talen purchased Brunner Island in 2015.  Brunner Island has three electric generation units that combust coal, natural gas, or a combination of the two.

3.      On August 29, 2018, Plaintiffs sent a Notice of Intent to Sue letter to Defendants and other recipients as required by Section 505(b)(1)(A) of the CWA, 33 U.S.C. § 1365(b)(1)(A).  Exhibit 1, Lower Susquehanna Riverkeeper Association, Waterkeeper Alliance, and PennEnvironment, Notice of Intent to Sue for Violations of the Clean Water Act and Pennsylvania's Clean Streams Law at the Brunner Island Steam Electric Station in York County, Pennsylvania (Aug. 29, 2018) ("NOI").

4.     During the process of burning coal, Brunner Island generates coal combustion residuals ("CCR") as that term is defined in 40 C.F.R. § 257.53 (stating that "CCR" "means fly ash, bottom ash, boiler slag, and flue gas desulfurization materials generated from burning coal for the purpose of generating electricity by electric utilities and independent power producers"), and other waste. CCR includes "coal ash" as that term is defined in 25 Pa. Code Section 287.1 "[f]or purposes of 25 Pa. Code Chapter 288" (which "includes fly ash, bottom ash or boiler slag resulting from the combustion of coal," whether or not it is or has "been beneficially used, reused or reclaimed for a commercial, industrial or governmental purpose").  For purposes of this Complaint, the wastes generated by Defendants at Brunner Island when coal is burned are referred to as "coal ash."

5.     As of 2017, Brunner Island generated 251,300 tons of coal ash annually. U.S. Energy Information Administration, Form 923, Schedule 8A (2017).

6.     Defendants disposed of coal ash and coal ash wastewater into Ash Basin 6, an unlined surface impoundment, until June 1, 2019.  Ash Basin 6 has not been dewatered.  Defendants currently dispose of coal ash in Disposal Area 8, a landfill that was constructed atop Ash Basin 5, an unlined, closed surface impoundment.

3

7.     The CWA prohibits any person from discharging any pollutant into waters of the United States from a point source without compliance with a National Pollutant Discharge Elimination System ("NPDES") permit. 33 U.S.C. §§ 1311(a), 1342. Pennsylvania's CSL similarly prohibits the discharge of industrial waste or pollution into waters of the Commonwealth by any person. 35 Pa. Cons. Stat. §§ 691.1, 691.301, 691.307, 691.401. Pursuant to the CSL, groundwater is a water of the Commonwealth. 35 Pa. Cons. Stat. §§ 691.1.

8.     The Pennsylvania Department of Environmental Protection ("DEP") is authorized to administer the CWA's NPDES permitting program for the Commonwealth of Pennsylvania.  *See* 33 U.S.C. § 1342; *see, e.g.,* 67 Fed. Reg. 55,841, 55,842 (Aug. 30, 2002) (stating that the Environmental Protection Agency ("EPA") delegated to DEP authority to issue NPDES permits on June 30, 1978). DEP issues NPDES permits pursuant to its authority under the CWA and the CSL. *See, e.g.*, 25 Pa. Code § 963.1 (defining a "Part I Permit" as an NPDES permit "issued by the Department under section 5 of the CSL (35 Pa. Cons. Stat. § 691.5) and section 402 of the [CWA] (33 U.S.C. § 1342)").

9.     DEP reissued NPDES Permit No. PA0008281 to Brunner Island, LLC on July 27, 2018.  Exhibit 2, DEP, Authorization to Discharge Under the National Pollutant Discharge Elimination System, Discharge Requirements for Industrial Wastewater Facilities, NPDES Permit No. PA0008281 (July 27, 2018) (issued to

4

Brunner Island, LLC, effective Aug. 1, 2018). The previous NPDES permit was issued in 2006 and expired in 2011 but remained in effect, as administratively continued, until the current permit was reissued because Brunner had submitted a timely renewal application. Exhibit 3, DEP, Authorization to Discharge Under the National Pollutant Discharge Elimination System, Discharge Requirements for Industrial Wastewater Facilities, NPDES Permit No. PA0008281 (effective Oct. 1, 2006) (issued to PPL Brunner Island, LLC, as amended Sept. 26, 2008). References hereafter to the "NPDES Permit" refer to the permit in effect at the time a violation(s) occurred.

10.     The NPDES Permit authorized and continues to authorize Brunner to discharge specific pollutants from Brunner Island from several permitted outfalls, with enforceable limits on several pollutants. The NPDES Permit never authorized and does not authorize discharges from seeps, springs, or discharges through hydrologically connected groundwater from Ash Basin 6, Ash Basin 5, or Disposal Area 8 to the Susquehanna River or its tributaries.

11.     Brunner has been discharging, and continues to discharge, coal ash, including arsenic, boron, chloride, chromium, cobalt, fluoride, lithium, manganese, molybdenum, strontium, sulfate, and other pollutants, from coal ash disposal units at Brunner Island into the Susquehanna River and its tributaries, including Hartman Run and the portion of Hartman Run known as "Black Gut Creek,"

through numerous seeps, a spring and other saturated areas, and groundwater that is hydrologically connected to surface waters without authorization pursuant to the Clean Water Act and/or the NPDES Permit. *See* Exhibit 1. For purposes of this Complaint, seeps, spring(s), and other saturated areas at Brunner Island shall be referred to hereafter as "seeps."

12.    Brunner also has been discharging, through permitted outfalls, heated wastewater (as measured by hourly instream temperature and heat rejection rates), total suspended solids, total residual chlorine, total residual oxidants, and total phosphorus in excess of the permitted limits contained in the NPDES Permit and also have failed to comply with other permit conditions, such as timely reporting of noncompliance and the requirement to take all reasonable steps to minimize or prevent unpermitted discharges. *See* Exhibit 1.

13.    The 2018 NPDES Permit, the 2006 NPDES Permit, and all conditions contained therein are each "a permit or condition thereof issued under [33 U.S.C. § 1342]," and as such are each an "effluent standard or limitation" as defined by Section 505(f)(6) of the CWA. 33 U.S.C. § 1365(f)(6).

14.    Brunner's discharges of coal ash without NPDES permit authorization violate the CWA and CSL.  Likewise, Brunner's discharges of pollutants that violate specific effluent limitations and failures to comply with other conditions of

the NPDES Permit violate the NPDES Permit and the requirements of the CWA and the CSL.

15.     Section 505(a)(1) of the CWA authorizes Citizens to bring suit for violations of the CWA and Brunner's NPDES Permit. 33 U.S.C. § 1365(a)(1).

16.     Citizens have satisfied the 60-day notice provision in Section 505(b)(1)(A) of the CWA and no bar to citizen enforcement exists pursuant to Section 505(b)(1)(B) of the CWA because neither EPA nor DEP has commenced a civil or criminal enforcement action in federal or state court and the violations alleged in the Notice of Intent to Sue letter and this Complaint will continue until this Court orders Defendants to abate the violations and take all steps necessary to come into full compliance with the CWA and CSL.

## Jurisdiction and Venue

17.     This Court has subject matter jurisdiction over this action pursuant to 33 U.S.C. § 1365(a) (regarding citizens' suits under the CWA) and 28 U.S.C. § 1331 (federal question jurisdiction), and supplemental jurisdiction regarding the CSL claims pursuant to 28 U.S.C. § 1367(a).

18.     Pursuant to 33 U.S.C. § 1365(c), venue is correct because the CWA violations alleged in this Complaint occurred and are occurring in this District.

19.     Pursuant to Section 505(b)(1)(A) of the CWA, 33 U.S.C. § 1365(b)(1)(A), Citizens gave notice more than 60 days prior to the

commencement of this action to all required parties, including: 1) Defendants; 2) DEP; and 3) EPA. *See* Exhibit 1.

20.     Neither EPA nor the Commonwealth of Pennsylvania has commenced or is diligently prosecuting a civil or criminal action against Talen or Brunner in a court of the United States or the Commonwealth of Pennsylvania to require compliance with the laws, rules, regulations, permits, standards, limitations, or orders at issue in this case.

21.     As explained below, Brunner has discharged and continues to discharge arsenic, boron, lithium, and other pollutants without authorization from the NPDES Permit, the CWA, or the CSL. Brunner is also discharging pollutants in violation of the numeric limitations contained in the NPDES Permit and is failing to adhere to other permit conditions and limitations, in violation of the CWA and the CSL. Therefore, the violations alleged herein will continue until this Court enjoins Defendants from discharging in violation of, and without authorization from, the NPDES Permit, the CWA, and the CSL and orders Defendants to address and remedy the underlying causes of the violations.

## Parties

22.     The Plaintiffs in this action are three not-for-profit citizen groups, the Lower Susquehanna Riverkeeper Association, Waterkeeper Alliance, and PennEnvironment.

23.     Plaintiff Lower Susquehanna Riverkeeper Association ("LSRA") is a 501(c)(3) nonprofit watershed association licensed by the Waterkeeper® Alliance on September 15, 2005. The LSRA is dedicated to improving and protecting the ecological integrity of the Susquehanna Watershed and the Chesapeake Bay by identifying sources of pollution and enforcing environmental laws. The LSRA also actively educates the public on current issues, works with decision-makers to emphasize the economic and social benefits of protecting our watershed, and, when necessary, enforces laws protecting communities and natural resources of the Susquehanna Watershed. Many of the LSRA's members are avid kayakers, fishermen, bird watchers, business owners, and other users of the Lower Susquehanna River and its tributaries, including Hartman Run and the Lower Susquehanna River watershed. These members have been injured and continue to be injured by Talen's pollution that violates environmental laws, as described herein, as these violations threaten members' use and enjoyment of the Lower Susquehanna River and the groundwater and tributaries that flow into the Lower Susquehanna River.

24.     Plaintiff Waterkeeper Alliance unites more than 300 Waterkeeper Organizations and Affiliates that are on the frontlines of the global water crisis, patrolling and protecting more than 2.5 million square miles of rivers, lakes, and coastal waterways on 6 continents. The Waterkeeper movement defends the

fundamental human right to drinkable, fishable, and swimmable waters, and combines firsthand knowledge of local waterways with an unwavering commitment to the rights of communities. Within the United States, Waterkeeper Alliance, Inc. works with more than 170 Waterkeeper Organizations and Affiliates. One of Waterkeeper Alliance's member organizations is the LSRA, whose members' use and enjoyment of the Lower Susquehanna River and its tributaries and groundwater are injured and will continue to be injured by Talen's pollution of these waterways in violation of the Clean Water Act and the Clean Streams Law.

25.     Plaintiff PennEnvironment is a Pennsylvania non-profit corporation organized for the purpose of conducting public interest research, policy development, and analysis, public education, litigation, and advocacy to protect the environment and people of Pennsylvania, including the quality of Pennsylvania's waters. PennEnvironment has long been concerned about pollution in the Susquehanna River, including the Lower Susquehanna River and its tributaries, and released a report in November 2017 regarding the impacts of budget cuts to the Susquehanna Riverkeeper. PennEnvironment was formed in 2002 to carry on the environmental work previously conducted by the Pennsylvania Public Interest Research Group. PennEnvironment currently has approximately 15,000 members in Pennsylvania. Many of PennEnvironment's members live near, work near, fish in and along, swim in, kayak in, or enjoy the wildlife along the Susquehanna River

near Brunner Island, and its members are very concerned about the quality of the water and impacts to wildlife from pollution at Brunner Island. PennEnvironment's members' use and enjoyment of the Lower Susquehanna River has been impaired and will continue to be impaired by Defendants' environmental violations (detailed herein) at Brunner Island.

26.     The interests that LSRA, Waterkeeper Alliance, and PennEnvironment seek to protect are germane to their organizations' purposes.

27.     Neither the claims asserted nor the relief requested requires the participation of the individual members of LSRA, Waterkeeper Alliance, or PennEnvironment in this action.

28.     Defendants Talen and Brunner are a Delaware corporation and a Delaware limited liability corporation, respectively, both registered to conduct business in the Commonwealth of Pennsylvania. Brunner is a subsidiary of Talen. Talen and Brunner are each a "person" as that term is defined by the CWA and the CSL.

29.     Talen maintains a business address of 600 Hamilton Street, Suite 600, Allentown, Pennsylvania 18101.  Brunner maintains a business address of 600 Hamilton Street, Suite 600, Allentown, Pennsylvania 18101.

## Legal Requirements

### *The Clean Water Act and the Clean Streams Law*

30.     The CWA was enacted in 1972 to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). In furtherance of that goal, the CWA prohibits any person from discharging any pollutant unless in compliance with certain requirements of the CWA, including the NPDES permit program. 33 U.S.C. §§ 1311(a), 1365(a)(1), 1342. The CWA prohibits the discharge of any pollutant by any person from a point source into waters of the United States unless such discharge is in compliance with a NPDES permit issued under the CWA. *Id.*

31.     The CWA defines "pollutant" as including "solid waste," "chemical wastes," "biological materials, radioactive materials, heat," "and industrial . . . waste discharged into water." 33 U.S.C. § 1362(6).

32.     "Person" "means an individual, corporation, partnership," or "association," in addition to other terms. *Id.* § 1362(5).

33.     "The term 'discharge of a pollutant' and the term 'discharge of pollutants' each means (A) any addition of any pollutant to navigable waters from any point source . . . ." *Id.* § 1362(12).

34.     "Navigable waters" means "the waters of the United States . . . ." *Id.* § 1362(7).

35.     "The term 'point source' means any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged. . . ." *Id.* § 1362(14).

36.     Sections 301 and 307 of the CSL similarly prohibit any person from discharging "industrial wastes" into waters of the Commonwealth, including groundwater, unless in compliance with a permit issued by DEP or the rules and regulations of DEP, and Section 401 of the Clean Streams Law further prohibits any person from "permit[ting] to be discharged from property owned or occupied by such person . . . into any of the waters of the Commonwealth, any substance of any kind or character resulting in pollution as herein defined." 35 Pa. Cons. Stat. §§ 691.301, 691.307, 691.401.

37.     Under the CSL, "[i]ndustrial waste" means "any liquid, gaseous, radioactive, solid or other substance, not sewage, resulting from any manufacturing or industry, or from any establishment, as herein defined, and mine drainage, refuse, silt, coal mine solids, rock, debris, dirt and clay from coal mines, coal collieries, breakers or other coal processing operations," including "all such substances whether or not generally characterized as waste."  35 Pa. Const. Stat. § 691.1 ("Definitions").

38.    Under the CSL, "person" includes "any natural person, partnership,

association or corporation . . . ." *Id.*

39.    Under the CSL:

"Pollution" shall be construed to mean contamination of any waters of
the Commonwealth such as will create or is likely to create a nuisance
or to render such waters harmful, detrimental or injurious to public
health, safety or welfare, or to domestic, municipal, commercial,
industrial, agricultural, recreational, or other legitimate beneficial uses,
or to livestock, wild animals, birds, fish or other aquatic life, including
but not limited to such contamination by alteration of the physical,
chemical or biological properties of such waters, or change in
temperature, taste, color or odor thereof, or the discharge of any liquid,
gaseous, radioactive, solid or other substances into such waters. The
department shall determine when a discharge constitutes pollution, as
herein defined, and shall establish standards whereby and wherefrom it
can be ascertained and determined whether any such discharge does or
does not constitute pollution as herein defined.

*Id.*

40.    Section 505(a)(1)(A) of the CWA states that Citizens are entitled to

bring suit against "any person . . . alleged to be in violation" of an "effluent

standard or limitation" established under the CWA as defined in Section 505(f),

which includes "a permit or condition of a permit issued under section 1342 of [the

CWA]." 33 U.S.C. §§ 1365(a)(1)(A), 1365(f). Citizen suits are similarly

authorized by the CSL. 35 Pa. Cons. Stat. § 691.601.

41.    Any person who discharges any pollutant without authorization of an

NPDES permit violates section 301(a) of the CWA and can be subject to a civil

penalty of up to $37,500 per violation per day that occurred before November 2,

2015 and up to $54,833 per violation per day that occurred after November 2, 2015. 40 C.F.R. § 19.4 tbls. 1, 2; 33 U.S.C. §§ 1311(a), 1319(d), 1365(a) (authorizing suits and also authorizing a district court to "apply any appropriate civil penalties under section 1319(d)"). Any person who violates the CSL, or a permit or regulation pursuant thereto, including by discharging, placing or allowing the flow of industrial waste or other pollution to groundwater without authorization, can be subject to a civil penalty of up to $10,000 per violation per day. 35 Pa. Cons. Stat. § 691.605(a).

## Factual Allegations

### *The Facility*

42.    Brunner Island has been burning coal to generate electricity—and producing hundreds of thousands of tons per year of coal ash—since 1961. *See* Exhibit 1, at 2. The island upon which Brunner Island sits borders the Susquehanna River on the east and Hartman Run and Black Gut Creek on the west. According to Defendants' contractors, groundwater under Brunner Island flows outward toward both the Susquehanna River and Black Gut Creek. *See, e.g., id.* at 5.  Defendants have disposed and continue to dispose or otherwise manage coal ash by placing it either in onsite, unlined impoundments or in their landfill. At issue in this Complaint are three specific units, Ash Basin 6, Ash Basin 5, and Disposal Area 8.

*Ash Basin 6*

43.     Ash Basin 6 is an unlined, 68-acre surface impoundment at Brunner

Island. As of the time the NOI was sent, it held approximately 3.2 million tons of

coal ash waste. The eastern boundary of the basin is 700 feet or less from the

Susquehanna River and the western boundary of the basin is 700 feet or less from

Black Gut Creek.

44.     Defendants' records acknowledge that Ash Basin 6 is leaking and that

the bottom layers of coal ash are in direct contact with groundwater. Defendants'

records also acknowledge that the groundwater flows directly to the Susquehanna

River toward the east and to its tributaries to the west. *See, e.g.,* Exhibit 1, at 5–7,

10–19.

45.     Prior to June 1, 2019, the coal ash sent to Ash Basin 6 flowed from

the north end of the basin to a polishing pond through a stop log structure before

being discharged to the Susquehanna River via NPDES permitted Outfall 004.

Defendants' records indicate that up to 20% of the coal ash wastewater disposed in

Ash Basin 6—or one million gallons per day—failed to be conveyed to the

polishing pond for eventual discharge through permitted Outfall 004.  Any Ash

Basin 6 wastewater that did not get discharged through Outfall 004 was discharged

to groundwater in and beneath the basin and, because the groundwater is

hydrologically connected to surface waters, to the Susquehanna River and its tributaries. Ash Basin 6 has not been dewatered.

*Ash Basin 5 and Disposal Area 8*

46.     Ash Basin 5, on top of which Disposal Area 8 was placed, is an inactive 100-acre impoundment just north of Ash Basin 6 that was closed in 1988 with nearly 5.5 million cubic yards of coal ash (predominantly fly ash) left in place. Exhibit 1, at 7. The eastern boundary of Ash Basin 5 is approximately 500 feet or less from the Susquehanna River and the western boundary is approximately 500 feet or less from Black Gut Creek. The western boundary of Disposal Area 8 is located approximately 800 feet from Black Gut Creek. According to Defendants' own contractor, Ash Basin 5 is potentially unstable. *Id.*

47.     Disposal Area 8, a 21-acre landfill that actively receives coal ash, was constructed between 2006 and 2009, and was built directly on top of Ash Basin 5.

48.     Groundwater beneath Ash Basin 5 and Disposal Area 8 is at a higher elevation than the Susquehanna River and Black Gut Creek, and it flows radially outward and thus directly toward and into these surface waters, which are within 500 to 800 feet.  Exhibit 1, at 10.

48.     Disposal Area 8 consists of three cells, though, as of November 2018, only Cell 1 (9 acres) was in use and lined. The liner for Cell 1 consists of a compacted clay layer as well as a geosynthetic clay layer. As of November 2018,

Talen reported that Cell 1 of Disposal Area 8 contained 152,667 tons of coal ash, which is about six percent of the total Landfill storage volume, with Defendants adding about 175 tons of coal ash to the landfill per week.  Disposal Area 8 has a leachate collection system that conveys leachate to the facility's treatment plant. Defendant's records indicate that Disposal Area 8's liner and leachate collection system have been inadequate, malfunctioned, or have otherwise failed to contain the coal ash deposited in the unit since at least 2011. Exhibit 1, at 7–9, 21, 25–26. The failure to contain coal ash in Disposal Area 8 allows coal ash pollutants to leak into unlined Ash Basin 5 and discharge to groundwater and, because this groundwater is hydrologically connected to surface waters, to the Susquehanna River and its tributaries. Defendants and their predecessor, PPL Brunner Island, LLC, have acknowledged the failures of the liner and/or leachate collection system to contain coal ash waste since at least 2015.  *Id.*

     49.    The discharge of pollutants from Ash Basin 5 and/or Disposal Area 8 is further evidenced by Defendants' acknowledgement that the groundwater table is within Ash Basin 5's ash layer and within inches of the ash deposited in Disposal Area 8.  Exhibit 1, at 10, 20.  Monitoring results of coal ash pollutants by Defendants also indicate ongoing discharge of coal ash to groundwater beneath Ash Basin 5 and Disposal Area 8.  *Id.* at 7–9, 19–27.

*Seeps*

50.     Defendants have documented and continue to monitor many seeps that discharge pollutants that are then conveyed downhill toward and into the Susquehanna River and its tributaries. Some of the seeps that are located near Ash Basin 6 and Ash Basin 5/Disposal Area 8 date back to at least 1990 and contain either contaminated groundwater or coal ash wastewater that leaked through the earthen berms of the Defendants' disposal units. Others, including the spring located at the northeast corner of Ash Basin 6, which is monitored by monitoring well MP-6-5, have formed from groundwater reaching the surface and penetrating surface soils.  Exhibit 1, at 28–36.  The NPDES Permit does not authorize these discharges.  Defendants' records acknowledge that the elevation of the seeps are higher than the elevation of the surrounding surface waters, and therefore acknowledge that the discharges from these areas flow or are capable of flowing directly over land and then into the Susquehanna River and its tributaries.  *Id*.

*The NPDES Permit*

51.     DEP reissued the NPDES Permit for Brunner Island on July 27, 2018 and it became effective on August 1, 2018. Exhibit 2. Prior to that, the NPDES Permit had last been reissued in 2006 (and amended in 2008). Exhibit 3. Although it expired on August 31, 2011, the 2006 NPDES Permit had been in effect through July 31, 2018 because it was administratively extended.

52.     Defendants' 2006 NPDES Permit authorized the discharge of certain pollutants from seven permitted Outfalls (001–007) subject to effluent limitations and monitoring requirements and from eighteen stormwater outfalls. Relevant to this Complaint, the 2006 NPDES Permit authorized the discharge of pollutants into the Susquehanna River as follows:

a.     Outfall 001: Noncontact cooling water at a monthly average discharge rate of 585 million gallons per day ("MGD");

b.     Outfall 003: Sanitary wastewater at a monthly average discharge rate of 0.017 MGD; and

c.     Outfall 007: Treated wastewater generated by the flue gas desulfurization (scrubber) towers at a long-term average discharge rate of 0.33 MGD.

53.     The 2018 NPDES Permit retained Outfalls 001 through 007 (with some revisions to the contributing waste streams), and added Outfall 008 and additional stormwater outfalls.  *See* Exhibit 2. The effluent limitations in the 2018 NPDES Permit relevant to the Complaint did not change.

54.     The pollutants for which there are effluent limits relevant to this Complaint, for Outfalls 001, 003, and 007 (discussed in more detail, below), include TSS, total phosphorus, total residual chloride, heat rejection rate, hourly

instream temperature change, and total residual oxidants. The NPDES Permit also contains several narrative standards and requirements.

## Causes of Action

55.    Each paragraph alleged above is incorporated by reference herein as if restated in full.

56.    Coal ash and the constituents in coal ash, including arsenic, boron, chloride, chromium, cobalt, fluoride, lithium, manganese, molybdenum, strontium, and sulfate, are "pollutants" as defined by Section 502(6) of the CWA. 33 U.S.C. § 1362(6).

57.    Talen and Brunner are each a "person" as that term is defined in Section 502(5) of the CWA and Section 1 of the CSL. 33 U.S.C. § 1362(5); 35 Pa. Cons. Stat. § 691.1.

58.    The Susquehanna River is a "navigable water" pursuant to section 502(7) of the CWA because it is a "water of the United States" as that term is defined by 40 C.F.R. § 230.3(s)(1) (the 1986/1988 regulatory definition of "waters of the United States").[1] 33 U.S.C. § 1362. The portion of Hartman Run known as "Black Gut Creek" and other tributaries of the Susquehanna River are also "waters

---

[1] This is the 1986/1988 regulatory definition of "waters of the United States" that EPA states is currently in effect following the President's February 28, 2017 Executive Order staying a 2015 revised regulatory definition. Exec. Order No. 13778, 82 Fed. Reg. 12,497 (Mar. 3, 2017).

of the United States," and therefore "navigable waters" under the CWA. 40 C.F.R. § 230.3(s)(5). The Susquehanna River, its tributaries, and groundwater itself are also waters of the Commonwealth under the CSL. 35 Pa. Cons. Stat. § 691.1.

   I.   <u>Discharge of Pollutants to Surface Waters via Hydrologically Connected Groundwater, in Violation of the Clean Water Act and Pennsylvania's Clean Streams Law</u>

59.     Each paragraph alleged above is incorporated by reference herein as if restated in full.

60.     Defendants' coal ash disposal units known as Ash Basin 6, Ash Basin 5, and Disposal Area 8 are each a "point source" as that term is defined in the CWA. 33 U.S.C. § 1362(14).

61.     Defendants' discharges of arsenic, boron, and other coal ash pollutants from Ash Basin 6, Ash Basin 5, and Disposal Area 8 to the Susquehanna River and its tributaries through groundwater that is hydrologically connected to such surface waters constitute the "discharge of a pollutant(s)" as that term is defined by the CWA and in violation of the CWA.  33 U.S.C. §§ 1362(12), 1311(a), 1342(a).

62.     Defendants do not have NPDES permit authorization to discharge coal ash pollutants from Ash Basin 6, Ash Basin 5, and Disposal Area 8 and therefore such discharges are occurring in violation of section 301(a) of the CWA. 33 U.S.C. § 1311(a).

63.     Defendants' unpermitted discharges of arsenic, boron, lithium, and other pollutants from Ash Basin 6, Ash Basin 5, and Disposal Area 8 to groundwater and to the Susquehanna River and its tributaries through hydrologically connected groundwater constitute unauthorized discharges of industrial waste and pollution to waters of the Commonwealth, in violation of the CSL. 35 Pa. Cons. Stat. §§ 691.1, 691.301, 691.307, 691.401.

64.     Pollutants disposed of by Defendants in Ash Basin 6, Ash Basin 5, and Disposal Area 8 have been and continue to be discharged into groundwater that is hydrologically connected to the Susquehanna River and its tributaries for at least the last five years.

65.     Defendants are subject under the CWA to a civil penalty of up to $37,500 per day for each violation that occurred before November 2, 2015, and up to $54,833 per day for each violation that occurred after November 2, 2015. 40 C.F.R. § 19.4 tbls. 1, 2; 33 U.S.C. §§ 1319(d), 1365(a).  Defendants are subject under the CSL to a civil penalty of up to $10,000 per day for each violation. 35 Pa. Cons. Stat. § 691.605(a).

66.     Plaintiffs also seek injunctive relief requiring Defendants to abate the violations described in this Cause of Action and come into compliance with the CWA and Pennsylvania's CSL.

II.    <u>Discharge of Pollutants to Surface Waters from Seeps, , in Violation of the Clean Water Act and Pennsylvania's Clean Streams Law</u>

67.    Each paragraph alleged above is incorporated by reference herein as if restated in full.

68.    The seeps at Brunner Island are each a "point source" as that term is defined in the CWA. 33 U.S.C. § 1362(14).  The location of seeps known to Plaintiffs at the time of the filing of this Complaint are set forth in the NOI. *See, e.g.,* Exhibit 1 at 28–36.

69.    Upon information and belief, seeps other than those identified in the NOI exist at Brunner Island.

70.    The seeps at Brunner Island contain "pollutants" as that term is defined in the CWA, 33 U.S.C. § 1362(6), because they contain groundwater contaminated by coal ash, coal ash wastewater that leaked through the walls of coal ash disposal units, or a combination of both.

71.    The liquid from the seeps flow or are capable of flowing over land into the Susquehanna River and its tributaries.

72.    Defendants' discharges of pollutants from seeps to the Susquehanna River and its tributaries constitute the "discharge of a pollutant(s)," as that term is defined by the CWA and in violation of the CWA.  33 U.S.C. §§ 1362(14), 1342(a).

73.     Defendants do not have NPDES permit authorization to discharge coal ash pollutants from seeps and therefore such discharges are occurring in violation of section 301(a) of the CWA. 33 U.S.C. § 1311(a).

74.     Defendants' unpermitted discharges from seeps also constitute the unauthorized discharge of industrial waste and pollution to waters of the Commonwealth, in violation of the CSL. 35 Pa. Cons. Stat. §§ 691.1, 691.301, 691.307, 691.401.

75.     The seeps at Brunner Island are currently discharging and have been discharging pollutants into the Susquehanna River and its tributaries for at least the last five years.

76.     Defendants are subject under the CWA to a civil penalty of up to $37,500 per day for each violation that occurred before November 2, 2015, and up to $54,833 per day for each violation that occurred after November 2, 2015. 40 C.F.R. § 19.4 tbls. 1, 2; 33 U.S.C. §§ 1319(d), 1365(a). Defendants are subject under the CSL to a civil penalty of up to $10,000 per day for each violation. 35 Pa. Cons. Stat. § 691.605(a).

77.     Plaintiffs also seek injunctive relief requiring Defendants to abate the violations described in this Cause of Action and come into compliance with the CWA and Pennsylvania's CSL.

III.     Unpermitted Discharges from the Entire Brunner Site in Violation of
the Clean Water Act and Pennsylvania's Clean Streams Law

78.     Each paragraph alleged above is incorporated by reference herein as if
restated in full.

79.     In the alternative to the First and Second Causes of Action,
Defendants are "persons" engaged in the "discharge of pollutants" from a "point
source," as those terms are defined in sections 502(12) and (14) of the CWA. 33
U.S.C. §§ 1362(12), (14).

80.     Defendants' mismanagement of the facility and failure to prevent
leaks and discharges of coal ash from its coal ash disposal units, as well as from
seeps, has rendered the entire facility a "point source."

81.     The facility-wide discharges of coal ash pollutants have occurred and
continue to occur over land and via groundwater that is hydrologically connected
to the Susquehanna River and its tributaries and constitute the "discharge of a
pollutant(s)" as that term is defined by the CWA and in violation of the CWA.  33
U.S.C. §§ 1362(12), 1311(a), 1342(a).

82.     Defendants do not have NPDES permit authorization to discharge
coal ash pollutants from the facility except as authorized in the NPDES Permit.

83.     The NPDES Permit does not authorize the discharge of coal ash
pollutants from coal ash disposal units or seeps and therefore such facility-wide

26

discharges are occurring in violation of section 301(a) of the CWA. 33 U.S.C.
§ 1311(a).

84.     Defendants' facility-wide discharges of coal ash pollution to
groundwater and to the Susquehanna River and its tributaries over land and
through hydrologically connected groundwater constitute unauthorized discharges
of industrial waste and pollution to waters of the Commonwealth, in violation of
the CSL. 35 Pa. Cons. Stat. §§ 691.1, 691.301, 691.307, 691.401.

85.     Defendants currently are discharging and have been discharging
pollutants from the Brunner Island facility over land and into groundwater that is
hydrologically connected to the Susquehanna River and its tributaries, and directly
into surface waters over land, for at least the last five years.

86.     Defendants are subject under the CWA to a civil penalty of up to
$37,500 per day for each violation that occurred before November 2, 2015, and up
to $54,833 per day for each violation that occurred after November 2, 2015. 40
C.F.R. § 19.4 tbls. 1, 2; 33 U.S.C. §§ 1319(d), 1365(a).  Defendants are subject
under the CSL to a civil penalty of up to $10,000 per day for each violation. 35 Pa.
Cons. Stat. § 691.605(a).

87.     Plaintiffs also seek injunctive relief requiring Defendants to abate the
violations described in this Cause of Action and come into compliance with the
Clean Water Act and Pennsylvania's CSL.

27

IV.   <u>Failure to Meet Permitted Effluent Limits</u>

88.   Each paragraph alleged above is incorporated by reference herein as if restated in full.

89.   The NPDES Permit imposes effluent limits regarding several pollutants discharged from the permitted outfalls at Brunner Island.

90.   Brunner has been in violation of certain effluent limitations regarding Outfalls 001 (non-contact cooling water), 003 (sanitary wastewater), and 007 (flue gas desulfurization wastewater), as self-reported in their monthly Discharge Monitoring Reports ("DMRs"), over 20 percent of the time throughout the last five years:

**Table 1: Effluent Violations of Talen's NPDES Permit (Nov. 2013–May 2019)**

| DATE | OUTFALL | EFFLUENT | PERMIT LIMIT | EXCEED-ANCE | LIMIT TYPE |
|------|---------|----------|--------------|-------------|------------|
| Nov 2013 | 003 | Total Suspended Solids (mg/L) | 30 | 90.50 | Average Monthly |
| Jan 2014 | 001 | Hourly Instream Temperature Change (F) | 2 | -2.1 | Instantaneous Maximum |
| Mar 2014 | 001 | Heat Rejection Rate (MBTU/day) | 91,870 | 112,814 | Maximum Daily |
| June 2014 | 003 | Total Residual Chlorine (mg/L) | 2 | 2.60 | Instantaneous Maximum |
| Nov 2014 | 003 | Total Suspended Solids (mg/L) | 30 | 125 | Average Monthly |
| Dec 2014 | 003 | Total Suspended Solids (mg/L) | 30 | 45 | Average Monthly |
| Jan 2015 | 003 | Total Suspended Solids (mg/L) | 30 | 75 | Average Monthly |
| Mar 2015 | 001 | Heat Rejection Rate (MBTU/day) | 91,870 | 148,277 | Maximum Daily |
| June 2015 | 001 | Total Residual Oxidants (mg/L) | 0.2 | 0.28 | Instantaneous Maximum |
| Oct 2015 | 001 | Hourly Instream Temperature Change (F) | 2 | 4.3 | Instantaneous Maximum |
| Feb 2016 | 001 | Hourly Instream Temperature Change (F) | 2 | 3.8 | Instantaneous Maximum |
| July 2016 | 003 | Total Phosphorus (mg/L) | 2 | 3.20 | Average Monthly |
| July 2016 | 003 | Total Suspended Solids (mg/L) | 30 | 66.00 | Average Monthly |
| Aug 2016 | 001 | Total Residual Oxidants (mg/L) | 0.2 | 0.29 | Instantaneous Maximum |
| Dec 2016 | 001 | Hourly Instream Temperature Change (F) | 2 | 2.4 | Instantaneous Maximum |
| Jan 2017 | 007 | Total Suspended Solids (mg/L) | 100 | 111 | Daily Maximum |

| DATE | OUTFALL | EFFLUENT | PERMIT LIMIT | EXCEED-ANCE | LIMIT TYPE |
|---|---|---|---|---|---|
| Jan 2017 | 007 | Total Suspended Solids (mg/L) | 30 | 75 | Average Monthly |
| Mar 2017 | 001 | Heat Rejection Rate (MBTU/day) | 91,870 | 110,269 | Maximum Daily |
| July 2017 | 003 | Total Phosphorus (mg/L) | 2 | 2.90 | Monthly Average |
| July 2017 | 003 | Total Suspended Solids (mg/L) | 30 | 50 | Monthly Average |
| Jan 2018 | 001 | Hourly Instream Temperature Change (F) | 2 | -2.6 | Instantaneous Maximum |
| Aug 2018 | 001 | Thermal Discharge (MBTU/day) | 75,170 | 84,746 | Daily Maximum |
| Aug 2018 | 003 | Total Suspended Solids (mg/L) | 30 | 46.5 | Monthly Average |
| Aug 2018 | 003 | Total Residual Chlorine (mg/L) | 1.63 | 1.92 | Instantaneous Maximum |
| Sept 2018 | 003 | Total Suspended Solids (mg/L) | 30 | 32 | Monthly Average |
| Jan 2019 | 003 | Total Residual Chlorine (mg/L) | 1.63 | 2.2 | Instantaneous Maximum |
| Mar 2019 | 001 | Thermal Discharge (MBTU/day) | 91,870 | 130,848 | Daily Maximum |
| Mar 2019 | 003 | Total Residual Chlorine (mg/L) | 1.63 | 2.2 | Instantaneous Maximum |

91.    Table 1, *above*, provides evidence of violations of NPDES Permit effluent limitations for total suspended solids, hourly instream temperature change, heat rejection rate, thermal discharge, total residual chlorine, total residual

oxidants, and total phosphorus. Exhibit 1, at 41–42, tbl. 3. Several of these are violations of monthly average effluent limitations.

92.     Brunner violated its NPDES Permit and section 301(a) of the CWA by discharging pollutants in excess of the effluent limitations set forth therein. 33 U.S.C. § 1311(a).

93.     There is no indication that steps are being taken to prevent the recurrence of these violations in the future.

94.     Each day a daily maximum or instantaneous maximum limit is exceeded for a particular pollutant is a separate violation for which a penalty can be assessed against Defendants. In addition, each day of each month where a monthly discharge limit is exceeded for a particular pollutant is a separate violation for which a penalty can be assessed against Defendants.

95.     Defendants are subject under the CWA to a civil penalty of up to $37,500 per day for each violation that occurred before November 2, 2015, and up to $54,833 per day for each violation that occurred after November 2, 2015. 40 C.F.R. § 19.4 tbls. 1, 2; 33 U.S.C. §§ 1319(d), 1365(a).  Defendants are subject under the CSL to a civil penalty of up to $10,000 per day for each violation. 35 Pa. Cons. Stat. § 691.605(a).

96.     Plaintiffs also seek injunctive relief requiring Defendants to abate the

violations described in this Cause of Action and come into compliance with the

CWA, Pennsylvania's CSL, and the NPDES Permit.

V.      Failure to Report Noncompliance as Required by the NPDES Permit

97.     Each paragraph alleged above is incorporated by reference herein as if

restated in full.

98.     Part A.X.C.3.a-d of the 2006 version of the NPDES Permit and Part

A.III.C.4 of the 2018 version of the NPDES Permit require Brunner to report to

DEP and provide details regarding instances of unanticipated noncompliance or

potential pollution that cause or threaten to cause pollution pursuant to 25 Pa. Code

§ 91.33. Exhibits 2, 3. These requirements, among others, also mandate that

Brunner take immediate steps to prevent injury to property and downstream users

of the waters from pollution or a danger of pollution, and where warranted, remove

the pollution from the ground and affected waters within fifteen days. Part A.X.C.4

of the 2006 version of the NPDES Permit and Part A.III.C.5 of the 2018 version of

the NPDES Permit require that Brunner report all other instances of

noncompliance not reported under Parts A.X.C.3.a or A.III.C.4 at the time

Brunner's DMRs are submitted. Exhibits 2, 3.

99.     Based upon a review of publicly available documents, and upon

information and belief, Brunner has not reported the discharge of pollutants to

surface waters on a facility-wide basis generally, and in particular from Ash Basin 6, Disposal Area 8, and/or Ash Basin 5, or from seeps as required by the NPDES Permit. Brunner also has failed to take steps to prevent downstream users of the waters from pollution or a danger of pollution resulting from its unpermitted discharges. Last, Brunner has failed to remove the pollution from the ground and affected waters within the timeframes described in the NPDES Permit.

100.    These violations are continuing and have occurred for at least the last five years. Each day that Brunner continues to discharge each pollutant from the Brunner Island facility to surface waters in violation of the requirements of Parts A.X.C.3.a-d or A.X.C.4 of the 2006 version of the NPDES Permit or Parts A.III.C.4 or A.III.C.5 of the 2018 version of the NPDES Permit is a separate violation of the NPDES Permit and section 301 of the CWA for which Defendants are subject to a civil penalty of up to $37,500 per violation per day that occurred before November 2, 2015 and up to $54,833 per violation per day that occurred after November 2, 2015. 40 C.F.R. § 19.4 tbls. 1, 2; 33 U.S.C. §§ 1311, 1319(d), 1365(a). Violations of these permit provisions are also violations of the CSL, for which injunctive relief to abate the noncompliance can be sought against Defendants and a civil penalty of up to $10,000 per violation per day can be imposed. 35 Pa. Cons. Stat. § 691.605(a).

101.    Plaintiffs also seek injunctive relief requiring Defendants to abate the violations described in this Cause of Action and come into compliance with the CWA and Pennsylvania's CSL.

VI.    Failure to Comply with NPDES Permit Requirement to Take All Reasonable Steps to Minimize or Prevent Any Discharge in Violation of the NPDES Permit

102.    Each paragraph alleged above is incorporated by reference herein as if restated in full.

103.    Part B.I.E of the NPDES Permit requires Brunner to take all reasonable steps to minimize or prevent any discharge, sludge use or disposal in violation of this permit that has a reasonable likelihood of adversely affecting human health or the environment. Exhibits 2, 3.

104.    As alleged above, Brunner is discharging coal ash pollutants to surface waters on a facility-wide basis and more particularly, from Ash Basin 6, Disposal Area 8, and/or Ash Basin 5, and from seeps, at concentrations so high as to pose a threat to fish and other aquatic species in the Susquehanna River and Black Gut Creek. The discharge of these pollutants is adversely affecting and will continue to adversely affect fish and aquatic species until the discharges cease. Exhibit 1 at Tbls. 1 & 2 & Appendices A–D.

105.    Defendants are aware of the concentration of coal ash pollutants discharged from Brunner Island to surface waters over land and via hydrologically

connected groundwater—as evidenced by the monitoring data they have collected, submitted to DEP, and posted publicly. In addition, the discharge of coal ash pollutants to groundwater and surface water at Brunner Island is well-documented in numerous other publicly-available documents, many of which are cited in Citizens' NOI. *See* Exhibit 1. However, Brunner has taken no credible steps to minimize or prevent the discharges.

106.   These violations are continuing and have occurred for at least the last five years. Every day that Brunner failed or fails to take all reasonable steps to minimize or prevent any discharge, sludge use or disposal that has a reasonable likelihood of adversely affecting human health or the environment in violation of the requirements of Part B.I.E. is a separate violation of the NPDES Permit and section 301 of the CWA for which Defendants can be subject to a civil penalty of up to $37,500 per violation per day that occurred before November 2, 2015 and up to $54,833 per violation per day that occurred after November 2, 2015. 33 U.S.C. § 1311; 40 C.F.R. § 19.4 tbls. 1, 2; 33 U.S.C. §§ 1319(d), 1365(a). A violation of this provision of the NPDES Permit is also a violation of the CSL for which injunctive relief to abate the noncompliance can be sought and a civil penalty of up to $10,000 per violation per day can be imposed. 35 Pa. Cons. Stat. § 691.605(a).

107.   Plaintiffs also seek injunctive relief requiring Defendants to abate the violations described in this Cause of Action and come into compliance with the CWA and Pennsylvania's CSL.

## Prayer for Relief

108.   WHEREFORE, Citizens respectfully request that this Court:

a.   Declare that Brunner is in violation of the NPDES Permit, and that Defendants are in violation of the CWA and the CSL;

b.   Enjoin Defendants from further violating the NPDES Permit, the CWA, and the CSL;

c.   Order Defendants to assess and remediate the harm caused by their violations;

d.   Assess civil penalties against Defendants;

e.   Award Citizens the cost of litigation, including reasonable attorney's fees, costs, and expert fees and expenses;

f.   Retain jurisdiction to ensure compliance with the Court's decree; and

g.   Grant such other relief as the Court deems just and proper.

Respectfully submitted,


Date: July 29, 2019          /s/ Lisa Hallowell

Lisa Widawsky Hallowell, Esquire
Bar ID No. PA207983
Environmental Integrity Project
1000 Vermont Avenue, NW, Suite 1100
Washington, DC 20005
Telephone: (202) 294-3282
Fax: (202) 296-8822
Lhallowell@environmentalintegrity.org